**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANGELA WONG and BARBARA LYNN GETEK, | : <br> : <br> : |
| Plaintiffs, | : <br> : NO: |
| vs. | : <br> : |
| BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER ESSURE INC., BAYER HEALTHCARE PHARMACEUTICALS, INC., | : <br> : <u>JURY TRIAL DEMANDED</u> <br> : |
| Defendants. | : <br> : <br> : |

## COMPLAINT FOR DAMAGES

**NOW COME** Plaintiffs, ANGELA WONG and BARBARALYNN GETEK, by and through the undersigned attorneys, who seek judgment against Defendants, Bayer Corporation, Bayer HealthCare LLC, Bayer Essure®, Inc., and Bayer Healthcare Pharmaceuticals, Inc. for the personal injuries they sustained as a result of being prescribed, receiving, and subsequently using the defective and unreasonably dangerous permanent birth control device Essure®.

At all times relevant hereto, Essure® was manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold by Defendants or Conceptus, Inc., which was acquired by Defendants on or about April 28, 2013.

## PARTIES, JURISDICTION, AND VENUE

### 1.    PLAINTIFFS

1.    Plaintiff ANGELA WONG is a resident and citizen of Peabody, MA, in Essex County.

2.      Plaintiff BARBARA LYNN GETEK is a resident and citizen of Central Square, NY in Oswego County.

## 2.    DEFENDANTS

2.      BAYER CORPORATION is a for-profit corporation incorporated in the state of Indiana. At all relevant times, Bayer Corporation's principal office was located at 100 Bayer Rd. Building 4, Pittsburgh, Allegheny County, PA 15205. Bayer Corporation is a wholly-owned subsidiary of Bayer AG. Recently, on or around January 1, 2017, Bayer Corporation changed the principal office to New Jersey. However, Bayer Corporation's officers are located in Pittsburgh, Pennsylvania. Defendant, Bayer Corporation, is currently a citizen of New Jersey and Indiana, and is authorized to do and does business throughout the Commonwealth of Pennsylvania. Defendant, Bayer Corporation, is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, and marketing its products, including the Essure® device.

3.      BAYER CORP. is the parent corporation of BAYER HEALTHCARE, LLC, BAYER ESSURE, INC., and BAYER HEALTHCARE PHARMACEUTICALS, INC. (the "Bayer subsidiaries").   BAYER CORP. owns 100% of the Bayer subsidiaries.

4.      At all relevant times, the Bayer subsidiaries are agents or apparent agents of BAYER CORP. and/or BAYER A.G.  Each Defendant acted as the agent of the other Defendant and acted within the course and scope of the agency, regarding the acts and omissions alleged. Together, the Defendants acted in concert and or abetted each other and conspired to engage in the common course of misconduct alleged herein for the purpose of enriching themselves and creating an injustice at the expense of Plaintiffs.

5.      In addition, the Bayer subsidiaries, individually and/or collectively, are "Alter Egos" of BAYER CORP. as, *inter alia,* they are wholly owned by BAYER CORP; share the same trademark; share management and officers; and in other ways were dominated by BAYER CORP.

6.      Moreover, there exists and at all times mentioned herein there existed a unity of interest in ownership and among all Defendants such that individuality and separateness between and among them has ceased.  Because Defendants are "Alter Egos" of one another and exert control over each other, adherence to the fiction of the separate existence of these Defendants as entities distinct from one another will permit an abuse of the corporate privilege, sanction fraud, and promote injustice.   BAYER CORP. wholly ignored the separate status of the Bayer subsidiaries separate status and so dominated and controlled its affairs that its separate entities were a sham.

7.      BAYER HEALTHCARE LLC is a for-profit corporation incorporated in the State of Delaware and is a wholly owned subsidiary of Bayer AG. Defendant, Bayer HealthCare LLC., with the principal office at 100 Bayer Blvd., Whippany, NJ 07981. Defendant, Bayer HealthCare LLC, is a citizen of Delaware, Pennsylvania, New Jersey, Germany, and the Netherlands, and is authorized to do and does business throughout the Commonwealth of Pennsylvania. Defendant, Bayer HealthCare LLC, is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, and marketing its products, including the Essure® device.

8.      BAYER ESSURE®, INC. (f/k/a CONCEPTUS, INC.) is a for-profit corporation incorporated in the State of Delaware and is a wholly owned subsidiary of Bayer HealthCare LLC. On or about April 28, 2013, Conceptus, Inc. entered into an Agreement and Plan of Merger (the "Merger Agreement") with Bayer HealthCare LLC. On or about June 5, 2013, pursuant to the Merger Agreement, Conceptus, Inc. became a wholly owned subsidiary of Bayer HealthCare LLC, and thereafter renamed "Bayer Essure® Inc." For purposes of this Complaint, Conceptus, Inc. and Bayer Essure® Inc. are one and the same. Bayer Essure® Inc. has the principal office at 100 Bayer Boulevard, Whippany, NJ 07981. Defendant, Bayer Essure® Inc., is a citizen of Delaware and New Jersey, and is authorized to do and does business throughout the Commonwealth of Pennsylvania. Defendant, Bayer Essure® Inc., is engaged in the business of researching, developing, designing,

licensing, manufacturing, distributing, selling, and marketing its products, including the Essure® device.

9.      BAYER HEALTHCARE PHARMACEUTICALS, INC. is a for-profit corporation incorporated in the State of Delaware and is a wholly owned subsidiary of Bayer Corp. Defendant Bayer HealthCare Pharmaceuticals, Inc., has the principal office of 100 Bayer Blvd., Whippany, NJ 07981. Defendant, Bayer Healthcare Pharmaceuticals, Inc., is a citizen of Delaware and New Jersey, and is authorized to do and does business throughout the Commonwealth of Pennsylvania. Defendant, Bayer Healthcare Pharmaceuticals, Inc., is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, and marketing its products, including the Essure® device.

10.     Defendants Bayer Corporation, Bayer HealthCare LLC, Bayer Essure®, Inc. (f/k/a Conceptus), and Bayer Healthcare Pharmaceuticals, Inc. are hereafter collectively referred to as "Bayer," or "Defendants," or the "Bayer Defendants."

11.     At all relevant times mentioned herein, Bayer authorized and directed and/or participated in the promotion and sale of Essure, when they knew, or with the exercise of reasonable care should have known, of the increased risks, hazards and unreasonably dangerous propensities, and thereby actively participated in the tortious conduct which resulted in the serious injuries to Plaintiffs herein.

12.     There exists, and at all times herein mentioned, there existed, a unity of interest in ownership between the certain Defendants and other Defendants such that any individuality and separateness between them has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as any entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and/or would promote injustice.

7

13.    At all times herein mentioned, the Bayer Defendants, and each of them, were engaged in the business of, or were successors-in-interest to entities engaged in the business of, researching, designing, formulating, compounding, testing, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing, and/or advertising for sale, and selling the Essure device. These products were for use by plaintiffs ANGELA WONG, BARBARALYNN GETEK, and Plaintiffs' physicians. As such, each of the Bayer Defendants is individually, as well as jointly and severally, liable to Plaintiffs for damages. The harm caused to Plaintiffs resulted from the conduct of one or various combinations of the Defendants, and through no fault of Plaintiffs. There may be uncertainty as to which one or which combination of Defendants caused the harm. Defendants have superior knowledge and information on the subject of which one or which combination of the Defendants caused Plaintiffs ANGELA WONG's and BARBARALYNN GETEK's injuries. Thus, the burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by Plaintiffs.

14.    "Defendant" as used herein means each Defendant listed above independently and/or jointly, unless noted otherwise.

## **JURISDICTION AND VENUE**

15.    Jurisdiction is proper over Defendants in this Court based on 42 Pa. C.S.A.

§ 5301 because at all relevant times, Defendants engaged in continuous and substantial business activities in the Commonwealth of Pennsylvania.

16.    This Court has personal jurisdiction over the Defendants pursuant to, and consistent with, Pennsylvania's long-arm statute (42 Pa.C.S.§5322) and both the Commonwealth of Pennsylvania's and Federal Constitutional requirements of Due Process in so far that Defendants, acting through agents or apparent agents, committed one or more of the following:

a.    Defendants transacted, and continued to transact, business in the

Commonwealth of Pennsylvania, 42 Pa.C.S. § 5322 (a)(1), and conducted, and regularly conduct business, receive substantial revenues, and sell and perform services in Philadelphia, Philadelphia County, Pennsylvania;

    b.   Defendants have an interest in, use, or possess real property in the Commonwealth of Pennsylvania, 42 Pa.C.S.§5322 (a)(5); and

    c.   Requiring Defendants to litigate this claim in the Commonwealth of Pennsylvania does not offend traditional notions of fair play and substantial justice and is permitted by the United States Constitution.

23.   At all relevant times, Defendants were engaged in the business of designing, researching, developing, testing, licensing, manufacturing, marketing, advertising, promoting, selling, distributing, and/or introducing into interstate commerce throughout the United States, which necessarily includes the Commonwealth of Pennsylvania, and Philadelphia, either directly or indirectly through third parties, subsidiaries or related entities, the Essure® device.

17.   There is also "specific" personal jurisdiction, because Defendants used the State of Pennsylvania to develop, create a marketing strategy for, label, and/or work on the regulatory approval for Essure®, and all the Plaintiffs' claims arise out of or relate to the Defendants' contacts with Pennsylvania.

18.   At all relevant times, the Bayer Defendants transacted, solicited, and conducted business in Pennsylvania through their employees, agents, and/or sales representatives, and derived substantial revenue from such business in Pennsylvania, and committed torts in whole or in part against Plaintiffs in Pennsylvania including but not limited to negligent and wrongful conduct in connection with the design, development, testing, promoting, marketing, distribution, labeling and/or sale of Essure®.

19.   Venue is proper in this County pursuant to Pa. R.C.P. No. 2179, which provides, in relevant part, that "a personal action against a corporation or similar entity may be brought in and only in (1) the county where its registered office or principal place of business is located; [or] (2)

a county where it regularly conducts business," because all of the Defendants regularly conduct business in Philadelphia County.

20.   Venue is proper in this Court, pursuant to Pa. R. Civ. P. 1006 and 2179, as Philadelphia County, Pennsylvania is where the Bayer Defendants have their principal place of business and/or where they regularly conduct substantial business; where Plaintiffs' causes of action arose, and/or where a transaction or occurrence took place out of which this cause of action arose.

21.   This is an action for damages, exclusive of interest and costs, which exceeds the sum of fifty-thousand dollars ($50,000.00).

## INTRODUCTION

22.   This Complaint is brought by Plaintiffs ANGELA WONG and BARBARALYNN GETEK. Plaintiffs were implanted with a female birth control device, known as "Essure." The device is intended to cause bilateral occlusion (blockage) of the fallopian tubes by the insertion of micro-inserts into the fallopian tubes which then anchor and elicit tissue growth, theoretically causing the blockage. However, in reality, the device migrates from the tubes, perforates organs, breaks into pieces, and/or corrodes wreaking havoc on the female body.

23.   As a result of (1) Defendants' negligence described *infra* and (2) Plaintiffs' reliance on Defendants' warranties and representations, Defendants' Essure device caused Plaintiffs to experience physical pain and suffering from the Essure coil migration resulting in a hysteroscopic removal of Essure and robotic-assisted laparoscopic tubal sterilization.

24.   Essure had Conditional Premarket Approval ("CPMA") by the Food and Drug Administration ("FDA"). As discussed below, Essure became "adulterated" and "misbranded", pursuant to (1) the FDA due to Defendants' failure to conform with the FDA requirements prescribed in the CPMA and (2) violations of Federal Statutes and Regulations noted *infra.*

7

25.    Pursuant to Defendants' CPMA (which reads: "Failure to comply with conditions of approval invalidates this approval order"), the C.F.R, and the Federal Food, Drug and Cosmetic Act ("FD&C Act"): the product is "adulterated" and "misbranded" and thus, could not have been marketed or sold to Plaintiff's.

26.    Specifically, Essure was adulterated and misbranded as Defendants (1) failed to meet regular reporting requirements; (2) failed to report known hazards to the FDA; and (3) failed to comply with Federal laws regarding marketing and distribution as specifically described *infra.*

27.    The fact that Defendants failed to comply with these conditions is not a mere allegation made by Plaintiffs. These failures to comply with both the CPMA and Federal regulations are memorialized in several FDA findings, including Notices of Violations and Form 483's issued by the FDA.

28.    As discussed in greater detail *infra*, Defendants were cited by the FDA and the Department of Health for:

   a.   Failing to report and actively concealing eight (8) perforations which occurred as result of Essure;

   b.   Erroneously using non-conforming material in the manufacturing of Essure;

   c.   Failing to use pre-sterile and post-sterile cages;

   d.   Manufacturing Essure at an unlicensed facility; and

   e.   Manufacturing Essure for three years without a license to do so.

29. Defendants were also found by the FDA to be:

   a.   Not reporting…complaints in which their product migrated;

   b.   Not reporting to the FDA incidents of bowel perforation, Essure coils breaking into pieces and migrating out of the fallopian tubes;

   c.   Only disclosing twenty-two (22) perforations with having knowledge of at least 144 perforations;

7

d.  Not considering these complaints in their risk analysis for the design of Essure;

e.  Failing to have a complete risk analysis for Essure;

f.  Failing to analyze or identify existing and potential causes of non-conforming product and other quality problems;

g.  Failing to track the non-conforming product;

h.  Failing to follow procedures used to control products which did not confirm to specifications;

i.  Failing to have complete Design Failure Analysis;

j.  Failing to document CAPA activities for a supplier corrective action;

k.  Failing to disclose approximately 16,047 complaints to the FDA as MDR's (Medical Device Reports, which are suspected from the device malfunction or associated with injury); and

l.  Failing to provide the FDA with timely post-approval reports for its six-month, one-year, eighteen-month, and two-year report schedules.

30.  Most egregiously, on May 30, 2013, the FDA uncovered an internal excel spreadsheet with 16,047 entries for complaints which were not properly reported to the FDA. Here, Defendant did not disclose to the FDA complaints where its product migrated outside of the fallopian tube. Defendants' excuse was that those complaints were not reported because the patients were "not -at last contact- experiencing pain....and were mere trivial damage that does not rise to the level of a serious injury." Accordingly, the FDA again warned Defendants for violations of the FD&C Act.

31.  As a result, the "adulterated" and "misbranded" product, Essure, which was implanted in Plaintiffs, should never have been marketed or sold to Plaintiff's pursuant to Federal law.

32.  Lastly, Defendants concealed and altered the medical records of its own trial participants to reflect favorable data. Specifically, Defendants altered medical records to reflect less pain then was being reported during the clinical studies for Essure and changed the birth dates

of others to obtain certain age requirements that were needed to go through the PMA process. Subsequently, Defendants failed to disclose this and concealed it from Plaintiffs and their implanting physicians.

33.    Plaintiffs' causes of action are all based on deviations from the requirements in the CPMA and/or violations of Federal statutes and regulations.

34.    Plaintiffs' causes of action are also based entirely on the express warranties, misrepresentations, and deceptive conduct of Defendants, which were relied upon by Plaintiffs prior to having the device implanted. Under Pennsylvania law, Plaintiffs' claims for breach of express warranties are not preempted by the Medical Device Act ("MDA").

35.    In addition, Defendants failed to comply with the following express conditions and Federal regulations:

   a.   "Within 10 days after Defendant receives knowledge of any adverse reaction to report the matter to the FDA."

   b.   "Report to the FDA under the MDR whenever it receives information from any source that reasonably suggests that the device may have caused or contributed to a serious injury."

   c.   Report Due Dates: six-month, one-year, eighteen-month, and two-year reports.

   d.   A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in a CPMA approval order for the device. 21 C.F.R. Section 814.80.

   e.   Effectiveness of Essure is established by annually reporting on the 745 women who took place in the clinical tests.

   f.   Successful bilateral placement of Essure is documented for newly trained physicians.

   g.   Warranties are truthful, accurate, and not misleading.

   h.   Warranties are consistent with applicable Federal and State law.

36.    These violations rendered the product "adulterated" and "misbranded", precluding Defendants from marketing or selling Essure per the FDA and, more importantly, endangered the

7

lives of Plaintiffs and hundreds of thousands of women.

37.     Defendants actively concealed these violations and never advised Plaintiffs of the same. Had Plaintiffs known that Defendants were concealing adverse reactions, not using the conforming material approved by the FDA (and failing to track non-conforming material), not using sterile cages, operating out of an unlicensed facility, and manufacturing medical devices without a license to do the same, Plaintiffs never would have had Essure implanted.

## FACTS

A.      **DESCRIPTION OF ESSURE AND HOW IT WORKS**

38.     Essure is a permanent form of female birth control (female sterilization). The device is intended to cause bilateral occlusion (blockage) of the fallopian tubes by the insertion of micro-inserts into the fallopian tubes, which then anchor and elicit tissue growth, theoretically causing the blockage.

39.     The Essure system consists of three components: (1) two micro-inserts (coils), (2) a disposable delivery system, and (3) a disposable split introducer. All components are intended for single use.

40.     The micro-inserts are comprised of two metal coils, which are placed in a woman's fallopian tubes via Defendants' disposable delivery system and under hysteroscopic guidance (camera).

41.     The hysteroscopic equipment needed to place Essure was manufactured by a third party, is not a part of Defendants' CPMA, and is not a part of Essure. However, because Plaintiffs' implanting physicians did not have such equipment, Defendants provided it so that it could sell Essure.

42.     The Essure micro-inserts are constructed of a stainless-s t e e l inner coil, a dynamic outer coil made from a nickel and titanium alloy, called Nitinol, and a layer of polyethylene terephthalate, or polyester fibers, wound between the inner and outer coils. In other

words, the coils are metal-on-metal.

43.    Essure's disposable delivery system consists of a single handle containing a delivery wire, release catheter, and delivery catheter. The micro-inserts are attached to the delivery wire. The delivery handle controls the device, delivery, and release. Physicians are allowed to visualize this complicated process through the hysteroscopic (camera) equipment provided by Defendants.

44.    After placement of the coils in the fallopian tubes by Defendants' disposable delivery system, the micro-inserts expand upon release and are intended to anchor into the fallopian tube permanently.  The PET fibers in the coil allegedly elicit tissue growth blocking off the fallopian tubes.

45.    The coils are alleged to remain securely in place in the fallopian tubes for the life of the consumer and not migrate, break, or corrode.

46.    At 3-months following the procedure, the patient is to receive a "Confirmation Test" to determine whether the Essure micro-inserts are in the correct location and have created a complete occlusion in each fallopian tube. The Confirmation Test used is a hysterosalpingogram ("HSG Test").

47.    Regardless of the Confirmation Test, Defendants warrant that Essure allows for visual confirmation of each insert's proper placement during the procedure.

48.    Essure was designed, manufactured, and marketed to be used by the average gynecologists through the world, as a "quick and easy" and "non-surgical" outpatient procedure to be done without anesthesia.

**B.    EVOLUATION OF ESSURE**

49.    Essure was first designed and manufactured by Conceptus, Inc. ("Conceptus").

50.    Conceptus and Bayer Defendants merged on or about April 28, 2013.

51.    For purposes of this lawsuit, Conceptus and Bayer Defendants are one and the same.

52.    Essure, a Class III medical device, is now manufactured, sold, distributed, marketed, and promoted by Defendants.

53.    Defendants also trained physicians on how to use its device and other hysteroscopic equipment, including Plaintiffs' implanting physicians.

54.    Prior to the merger between Conceptus and Bayer Defendants, Conceptus obtained CPMA for Essure.

55.    By way of background, Premarket Approval ("PMA") is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. According to the FDA, Class III devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential, unreasonable risk of illness or injury.

56.    PMA is intended to be a stringent type of device marketing application required by the FDA. The applicant must receive FDA approval of its PMA application prior to marketing the device. PMA approval is based on a determination by the FDA.

57.    An approved PMA is, in effect, a private license granting the applicant (or owner) permission to market the device, assuming it complies with federal laws, any CPMA order and is not "adulterated" or "misbranded."

58.    FDA regulations provide 180 days to review the PMA and make a determination. In reality, the review time is normally longer. Before approving or denying a PMA, the appropriate FDA advisory committee may review the PMA at a public meeting and provide the FDA with the committee's recommendation on whether the FDA should approve the submission.

59.    However, the PMA process for Essure was "expedited" and several trial candidates' medical records were altered to reflect favorable data.

60.    According to the FDA, a Class III device that fails to meet the CPMA requirements

is considered to be adulterated under § 501(f) of the Federal Food, Drug and Cosmetic Act ("FD&C

Act") and cannot continue to be marketed, distributed, or advertised under 21 C.F.R. 814.80.

61.    Regarding the Premarket Approval Process, devices can either be "approved,"

"conditionally approved," or "not approved."

62.    Essure was "conditionally approved", or in other words, had only CPMA, not

outright PMA, the "gold standard."

63.    In the CMPA Order issued by the FDA, the FDA expressly stated, "Failure to

comply with the conditions of approval invalidates this approval order." The following were

conditions of the approval:

    a.    "Within 10 days after Defendant receives knowledge of any adverse reaction to
report the matter to the FDA."

    b.    "Report to the FDA whenever it receives information from any source that
reasonably suggests that the device may have caused or contributed to a serious
injury."

    c.    Effectiveness of Essure is established by annually reporting on the 745 women who
took part in the clinical tests.

    d.    Successful bilateral placement of Essure is documented for newly trained
physicians.

    e.    Warranties are truthful, accurate, and not misleading.

    f.    Warranties are consistent with applicable Federal and State law.

    g.    Conduct a post approval study in the US to document the bilateral placement rate
for newly trained physicians.

    h.    Include results from the annual reporting on the patients who took part in the Pivotal
and Phase II clinical investigations in the labeling as this data becomes available.

    i.    Submit a PMA supplement when unanticipated adverse effects, increases in the
incidence of anticipated adverse effects, or device facilitates, necessitate a labeling,
manufacturing, or device modification.

    j.    Submit a PMA supplement whenever there are changes to the performance of the
device.

C.    REQUIREMENTS UNDER FEDERAL REGULATIONS

64.    The CPMA also required Defendants to comply with the Medical Device Reporting

regulations and post-market requirements for Class III medical devices:

a.    Report to the FDA within thirty (30) days whenever they receive or otherwise become aware of information,  from  any source, that reasonably suggests a device may have caused or contributed to serious injury;

b.    Report to the FDA within thirty (30) days whenever they receive notice of a serious injury;

c.    Report to the FDA information suggesting that one of the Manufacturer's devices may have caused or contributed to a death or serious injury, or has malfunctioned and would be likely to cause death or serious injury if the malfunction were to recur, 21 CFR §§ 803.50 et seq.;

d.    Monitor the product after pre-market approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product, 21 CFR §§ 814 et seq.;

e.    Submit a PMA Supplement for any change in Manufacturing Site, 21 CFR §§ 814.39 et seq.;

f.    Establish and maintain quality system requirements to ensure that quality requirements are met, 21 CFR §§ 820.20 et seq.;

g.    Establish and maintain procedures for validating the  device design, including testing of production units under actual or simulated use conditions, creation  of a risk plan,  and conducting risk analyses, 21 CFR §§ 820.30 et seq.;

h.    Document all Corrective Action and Preventative Actions taken by the Manufacturer to address non-conforming and other internal quality control issues, 21 CFR §§ 820.100 et seq.;

i.    Establish internal procedures for reviewing complaints and event reports, 21 CFR §§ 820.198,  §§ 820.100 et seq., and §§ 820.20 et seq.;

j.    Establish Quality Management System (QMS) procedures to assess potential causes of non-conforming products and other quality problems, 21 CFR §§ 820.70 et seq. and 21 CFR §§ 27 820.90 et seq.;

k.    Report on Post Approval studies in a timely fashion, 21 CFR §§ 814.80; and

l.    Advertise the device accurately and truthfully, 21 CFR §§ 801 et seq.

65.    Defendants were also at all times responsible for maintaining the labeling of Essure.

Accordingly, Defendants had the ability to file "Special PMA Supplement – Changes Being Effected" ("CBE"), which allows Defendants to unilaterally update the labeling of Essure to reflect newly acquired safety information without advance approval by the FDA. 21 C.F.R. § 814.39(d). These changes include:

a.    Labeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association;

b.    Labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

c.    Labeling changes that ensure it is not misleading, false, or contains unsupported indications; and

d.    Changes in quality controls or manufacturing process that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength, or reliability of the device.

66.    Upon obtaining knowledge of these potential device failure modes, Defendants were required under the Essure CPMA, 21 CFR §§ 820.30 et seq., 21 CFR §§ 820.100 et seq., and the FDA Recognized Consensus Standard ISO 14971, to use this information to routinely update the risk analyses for Essure device and take any and all Corrective Action and Preventative Action ("CAPA") necessary to address non-conformance and other internal quality control issues. Furthermore, Defendants were required to establish Quality Management Systems ("QMS") procedures to assess potential causes of non-conforming products and other quality problems with the products, such as latent manufacturing defects. 21 CFR §§ 820.70 et seq.; 21 CFR §§ 820.30 et seq.

## D.    FAILURES OF THE DEVICE

67.    After obtaining the CPMA, Defendants became aware of potential quality and failure modes associated with the Essure devices, and failed to warn Plaintiffs and/or their implanting

physicians. Defendants became aware that the following failures could occur with the device and

lead to adverse consequences for the patient:

     a.  The stainless steel used in the device became un-passivated, which can cause the device to rust and degrade;

     b.  The nitinol could have a nickel rich oxide which the body attacks;

     c.  The "no lead" solder could, in fact, have trace lead in it;

     d.  The Galvanic action between the metals used to manufacture Essure, which causes the encapsulation of the product within the fallopian tubes, could be a continuous irritant to some patients;

     e.  The nitinol in the device can degrade due to High Nickel Ion release, increasing the toxicity of the product for patients;

     f.  Latent manufacturing defects such as cracks, scratches, and other disruption of the smooth surface of the metal coil, may have existed in the finished product, causing excess nickel to leach into the surrounding tissues after implantation;

     g.  Degradation products of the PET used in the implant can be toxic to patients, inciting both chronic inflammation and possible autoimmune issues;

     h.  The mucosal immune response to nickel is different than the immune response in non-mucosal areas of the body;

     i.  There was an inadequate solder joint between the inner and outer coils of the micro-insert which can cause the micro-insert to fracture/break apart, and which Bayer admits is or could be a reason for device breakage; and

     j.  The central axis was not fully adhered to the spring, which can cause the micro-insert to fracture/break apart, and which Bayer admits is or could be a reason for device breakage.

**E.    VIOLATIONS OF FEDERAL REQUIREMENTS**

    68.  In June 2002, the FDA found the following objectionable conditions:

     a.  Design outputs were not completely identified;

     b.  Corrective and preventative action activities were not being documented, including implementation of corrective and preventative actions; and

     c.  Procedures addressing verification of corrective preventative actions were not implemented.

69.    In July 2002, during an inspection of Defendants' facility, the FDA observed that adverse events were not captured in the data.

70.    In June 2003, the following observations were made by the FDA which resulted in Form 483s:

    a.    Two lot history records showed rejected raw materials, which was not documented and therefore could not be tracked; and

    b.    Procedures were not following for the control of products that did not conform to specifications.

71.    In July of 2002, the FDA found that:

    a.    Defendant "does not have an assurance/quality control unit."

72.    In December 2010, the FDA found that Defendants were "not reporting complaints of their product being seen radiographically in the patient's abdominal cavity" and "did not have a risk analysis of the coils being the abdominal cavity."

73.    Defendants failed to comply with several conditions:

    a.    Defendants failed to timely provide the FDA with reports after twelve months, eighteen months, and then a final report for one schedule. Defendants also failed to timely submit post approval reports for its six-month, one year, eighteen month and two year reports. All reports failed to meet the respective deadlines;

    b.    Defendants failed to document successful placement of Essure, concealing the failure rates;

    c.    Defendants failed to notice the FDA of several adverse reactions and actively concealed the same. Defendants failed to report 8 perforations which occurred as a result of Essure and was cited for the same by the FDA via Form 483;

    d.    Defendants failed to report to the FDA information it received that reasonably suggested that the device may have caused or contributed to a serious injury, concealing the injuries. Again, Defendants failed to report 8 perforations which occurred as a result of Essure, and was cited for the same by the FDA via Form 483;

    e.    As outlined *infra,* Defendants' warranties were not truthful, accurate, and were misleading.

    f.    Defendants' warranties were not consistent with applicable Federal and State law; and

g.  Defendants failed to notice the FDA of their internal excel file containing 16,047 entries of complaints.

74.  Defendants were also found to be:

a.  Erroneously using non-conforming material in the manufacturing of Essure and not tracking where it went;

b.  Failing to use pre-sterile and post-sterile cages;

c.  Manufacturing Essure at an unlicensed facility;

d.  Manufacturing Essure for three years without a license to do so;

e.  Not reporting…complaints in which their product migrated;

f.  Not considering these complaints in their risk analysis for the design of Essure; and

g.  Failing to document CAPA activities for a supplier corrective action.

75.  Specifically:

a.  On January 6, 2011, the FDA issued a violation to Defendants for the following: "An MDR report was not submitted within 30 days of receiving or otherwise becoming aware of information that reasonably suggests that a marketed device may have caused or contributed to a death or serious injury if the malfunction were to recur." Form 483/Violation Form issued by Timothy Grome on January 6, 2011. These failures include incidents regarding perforation of bowels, Essure coils breaking into pieces, and Essure coils migrating out of the fallopian tubes. Defendants were issued these violations for dates of incidents on 5/11/10, 9/1/10, 10/1/10, 10/5/10, 10/26/10, 11/3/10, 11/5/10, and 11/16/10;

b.  Defendants had notice of 168 perforations but only disclosed 22 to the FDA;

c.  On January 6, 2011, Defendants were cited for their risk analysis of Essure being incomplete.  Specifically, the FDA found that the Design Failure Modes Effects Analysis for Essure didn't include as a potential failure mode or effect, location of the micro-insert coil in the peritoneal cavity;

d.  On January 6, 2011, Defendants were cited for not documenting Corrective and Preventive Action Activities. Specifically, the FDA found that there were failures in Defendants' Design. The FDA also found that Defendants' CAPA did not mention the non-conformity of materials used in Essure or certain detachment failures. The FDA found that Defendants' engineers learned of this, and it was not documented;

e.  On July 7, 2003, Defendants were cited for not analyzing to identify existing and potential causes of non-conforming product and other quality problems.

7

Specifically, two lot history records showed rejected raw material, which was not documented on a quality assurance form, which is used to track the data. (Inner/outer coil subassemblies were rejected but then not documented, leading to the question of where the rejected components went); and

 f. On July 7, 2003, Defendants were cited for not following procedures used to control products, which did not conform to specifications.

76. In response, Defendants admitted that "the device may have caused or contributed to a death or serious injury, and an MDR Report is required to be submitted to the FDA."

77. In addition, Defendants' failure to timely file MDRs and to report to the FDA the complaints that were not addressed by the device's labeling and/or complaints that were occurring with an unexpected increase in severity and frequency, which it knew of from the more than 32,000 complaints it received, violated the CPMA, FDA post-marketing regulations, and parallel state law.

78. Moreover, Defendants did not provide the requisite training to the implanting physicians prior to the selling it to the same.

## F. FDA HEARINGS AND RESULTING ACTION

79. Defendants conduct not only violated its federal regulatory duties and its duties under state law, but also caused a massive failure of information that has to be present in the medical and scientific community to protect a patient's interest. Because Defendants failed to timely, completely, or accurately report their knowledge of risks and complications associated with the Essure device, the public's knowledge of the risks associated with Essure were seriously hampered and delayed. This endangered patient safety, including Plaintiffs' safety.

80. As the FDA continued to force Defendants to provide additional information known to them that had been withheld, more information belatedly was made known to the medical community, including information concerning the frequency, severity and permanence of complications associated with the prescription and implementation of the Essure device.

81. This belated and untimely release of relevant and important information lead to an increasing number of adverse events being reported to the FDA about Essure from patients

and  physicians. Because of these complaints, the FDA convened a public hearing concerning the

safety and efficacy of the Essure device. At that hearing, Defendants continued to misrepresent the

safety and efficacy of Essure:

    a.   The efficacy rates for Essure are 99.6%. In reality, studies show that the chances of becoming pregnant with Essure are higher than with tubal ligations and higher than the rates  reported by Bayer to the FDA at the public hearing;

    b.   Defendants testified that skin patch testing is not a reliable predictor of clinically significant reactions  to  nickel-containing implantable devices, including Essure. Despite this,  Bayer told physicians and patients that a nickel sensitivity test  was sufficient  to  determine whether  a  patient  was  a  suitable candidate for an Essure device;

    c.   Defendants testified that "[a]s an alternative to Essure,  laparoscopic tubal ligation is a safe and effective method of permanent birth control." In reality, studies show that the chances of becoming pregnant with Essure are higher than with tubal ligations, and Essure patients are much more likely to require additional surgeries to  correct  complications associated with  the  sterilization procedure; and

    d.   Defendants testified that most of the reports of adverse events to the FDA have come from consumers and not Defendants, which is unusual. In reality, Defendants failed to report thousands of complaints of adverse events that it had received.

    82.   On February 29, 2016, the FDA first  publicly announced "actions to  provide important information about the risks of using Essure and to help women and their doctors be better informed of the potential complications associated with" the device. The FDA took the following actions:

    a.   The FDA is requiring a black box warning on Essure to warn doctors and patients of "reported  adverse events, including perforation of  the uterus and/or fallopian tubes, intra-abdominal or pelvic device migration, persistent pain, and allergy or hypersensitivity reactions." The FDA draft guidance black box warning for  Essure also  warns: "Some  of  these  reported  events resulted in device removal that required  abdominal surgery. This information should be shared with patients considering sterilization with the Essure® device during discussion of the benefits and risks of the device."

    b.   The FDA is requiring Defendants to implement a Patient Decision Checklist "to help to ensure women receive and understand information regarding  the benefits and  risks" of Essure. The FDA's draft Patient Decision Checklist is a five- page document that the physician will discuss with each patient interested in  using the device. The patient must initial after  each topic of discussion, and both  the

physician and patient must sign the document. The topics for discussion include, *inter alia,* the risks for "adverse events including persistent pain, device puncture of the uterus and/or fallopian tubes ('perforation'), or movement of the device into the abdomen or pelvis ('intra-peritoneal migration')"; "allergy or hypersensitivity reactions"; symptoms such as changes in skin (rash, itching), "chest pain, palpitations, breathing difficulties or wheezing, and intestinal discomfort such as nausea, diarrhea, and vomiting"; "joint or muscle pain, muscle weakness, excessive fatigue, hair loss, weight changes, and mood changes"; the fact that "there is no reliable test to predict ahead of time who may develop a reaction to the device"; the possibility that the Essure device "can move after placement," possibly becoming ineffective at preventing pregnancy or leading to "serious adverse events such as bleeding or bowel damage, which may require surgery to address"; and the fact that if the Essure device has to be removed after placement, it will require surgery to remove and possibly a hysterectomy.

c.   The FDA has also ordered Bayer "to conduct a new post-market surveillance study designed to provide important information about the risks of the device in a real-world environment." The study must provide data on "the risks associated with Essure® and compare them to laparoscopic tubal ligation. This includes the rates of complications including unplanned pregnancy, pelvic pain and other symptoms, and surgery to remove the Essure® device. The study will also evaluate how much these complications affect a patient's quality of life….The FDA will use the results of this study to determine what, if any, further actions related to Essure® are needed to protect public health."

80.   Unfortunately, this new warning, labeling, and patient decision checklist came too late to warn Plaintiffs of the true risks of Essure. Had Defendants complied with their federal regulatory duties and their duties under state law by reporting the known risks and complications in a timely fashion, Plaintiffs and her physician would have had this relevant, critical information available to them prior to the implant of the Essure device. At all relevant times, Defendants' Essure product was prescribed and used as intended by Defendants and in a manner reasonably foreseeable to Defendants. Moreover, Defendants' misrepresentations regarding Essure discussed *infra,* in effect, over promoted Essure and nullified otherwise adequate warnings.

81.   Lastly, although Essure appears at first glance to be a "medical device," Defendants actually categorize it as a "drug."

82.   In short, (1) Essure is considered an "adulterated" and "misbranded" product that could not have been marketed or sold to Plaintiffs per the FDA and Federal law and (2) all of

Plaintiffs' claims center around violations of the CPMA requirements, and/or Federal regulations and statutes.

## G.   DEFENDANTS' TRAINING AND DISTRIBUTION PLAN

83.   Defendants (1) failed to abide by FDA-Approved training guidelines when training Plaintiffs' implanting physicians; (2) provided specialized hysteroscopic equipment to the implanting physicians who were not qualified or competent to the use the same; and (3) created an unreasonably dangerous distribution plan, all of which were aimed at capitalizing on and monopolizing the birth control market at the expense of Plaintiffs' safety and well-being.

84.   Because Essure was the first device of its kind, the implanting physicians were trained by Defendants on how to properly insert the micro-inserts using the disposable delivery system and was given hysteroscopic equipment by Defendants.

85.   In order to capture the market, Defendants independently undertook a duty of training physicians outside of FDA guidelines, including the implanting physicians, on how to properly use (1) its own mechanism of delivery, and (2) the specialized hysteroscopic equipment manufactured by a third party.

86.   Regarding Essure, Defendants' Senior Director of Global Professional Education stated, "training is the key factor when clinicians choose a new procedure," and "For the Essure procedure, the patient is not under anesthesia, therefore a skilled approach is crucial."

87.   In fact, because gynecologists and Plaintiffs' implanting physicians were unfamiliar with the device and how to deliver it, Defendants (1) created a "Physician Training Manual"; (2) created a simulator called EssureSim; (3) organized limited training courses, where Defendants observed physicians until Defendants believed they were competent; (4) created Essure Procedure Equipment Supplies Checklists; and (5) represented to Plaintiffs that "Physicians must be signed-off to perform Essure procedures."

88.    Defendants provided no training to the implanting physicians on how *to remove* Essure should it fail.

89.    Defendants also kept training records on all physicians "signed-off to perform Essure procedures."

90.    In order to sell its product and because the implanting physicians did not have access to the expensive hysteroscopic equipment, Defendants provided the implanting physicians with hysteroscopic equipment which, although is not part of Essure, is needed to implant Essure. The entrustment of this equipment is not part of any CPMA.

91.    In fact, Defendants entered into agreements with Johnson & Johnson Co., Olympus America, Inc., Richard Wolf Medical Instruments Corp., and Karl Storz Endoscopy, America, Inc., (1) to obtain specialized hysteroscopic equipment to then give to physicians, and (2) to increase its sales force to promote Essure.

92.    According to Defendants, these agreements allowed Defendants to "gain market presence…and expand…market opportunity by driving adoption among a group of physicians."

93.    In regard to the entrustment of such specialized equipment, Defendants admitted: "We cannot be certain how successful these programs will be, if at all." *See US SEC Form 10- Q: Quarterly Report Pursuant to Section 13 or 15(d)of the SEC Act of 1934.*

94.    Defendants "handed out" this hysteroscopic equipment to unqualified physicians, including Plaintiffs' implanting physicians, in an effort to sell its product.

95.    Defendants knew, or failed to recognize, that the implanting physicians were not qualified to use such specialized equipment yet provided the equipment to the unqualified implanting physician in order to capture the market.

96.    In return for providing the expensive hysteroscopic equipment, Defendants required that the implanting physicians purchase two Essure "kits" per month. This was a part of Defendants'

unreasonably dangerous and negligent distribution plan aimed solely at capturing the market with

reckless disregard for the safety of the public and Plaintiffs.

97.    Defendants' distribution plan included requiring the physicians to purchase two (2)

Essure "kits" per month, regardless of whether the physician used them or not. This distribution

plan created an environment which induced the implanting physicians to "push" Essure and implant

the device into Plaintiffs.

98.    In short, Defendants used the expensive hysteroscopic equipment to induce the

implanting physicians into an agreement as "bait." Once the implanting physicians "took the bait,"

they were required to purchase two Essure "kits" per month, regardless of whether they sold any

of the Essure "kits."

99.    This was an unreasonably dangerous distribution scheme as it compelled the

implanting physicians to sell two devices per month at the expense of Plaintiffs' safety and well-

being.

100.    Defendants' distribution plan also included (1) negligently distributing Essure in

violation of FDA orders and Federal regulations; (2) marketing and selling an "adulterated" and

"misbranded" product; (3) promoting Essure through representatives of the hysteroscopic

equipment manufacturers, who were not adequately trained nor had sufficient knowledge regarding

Essure; (4) failing to report and actively concealing adverse events which occurred as a result of

Essure; (5) erroneously using non-conforming material and failing to keep track of the same in the

manufacturing of Essure; (6) failing to use pre-sterile and post-sterile cages; (7) manufacturing

Essure at an unlicensed facility; and (8) manufacturing Essure for three years without a license to

do so.

101.    In short, Defendants (1) failed to abide by FDA-Approved training guidelines when

training Plaintiffs' implanting physicians; (2) provided specialized hysteroscopic equipment to

implanting physicians who were not qualified to use the same; and

(3) created an unreasonably dangerous distribution and reporting plan aimed at capitalizing and monopolizing the birth control market.

102.  All of this was done in violation of Federal law and its CPMA. Unfortunately, this was all done at the expense of Plaintiffs' safety.

## PLAINTIFFS' SPECIFIC ALLEGATIONS

103.  Plaintiff ANGELA WONG was implanted with the Essure device on or about October 24, 2012.

104.  Plaintiff BARBARALYNN GETEK was implanted with the Essure device on or about May 29, 2014.

105.  After being implanted with the Essure devices, Plaintiffs began to suffer from severe pelvic pain, excessive and frequent irregular menses, coil migration and dysmenorrhea.

106.  As a result of each Plaintiff's pelvic pain and excessive and frequent menses and severe and excessive bleeding during menstruation, Plaintiff ANGELA WONG had the Essure device removed on or about February 25, 2021 and Plaintiff BARBARALYNN GETEK had the Essure device removed on or about March 4, 2021.

## FRADULENT CONCEALMENT/ EQUITTABLE TOLLING

107.  Plaintiffs repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows.

108.  Defendants' failure to report, document, or follow up on the known adverse event complaints, and concealment of adverse events, known defects, serious increased risks, dangers, and complications, constitutes fraudulent concealment that equitably tolls any proffered statute of limitation that may otherwise bar the recovery sought by Plaintiffs herein.

109.  Defendants are estopped from relying on any statute of limitations defense  because

it continued to refute and deny reports and studies questioning the safety of Essure, actively and intentionally concealed the defects, suppressed reports and adverse information, sponsored and paid for studies which falsely characterized the risks and benefits of Essure, failed to satisfy FDA and PMA requirements, failed to satisfy FDA and PMA notification requirements, and failed to disclose known dangerous defects and serious increased risks and complications to physicians and Plaintiffs.

110.  Instead, Defendants continued to represent that Essure was safer, more effective and the best alternative for permanent female sterilization all the while they knew that this was absolutely false and not true.

111.  Defendants did the above acts, which were and are illegal under federal law, the PMA and parallel state law, to effectively market Essure and encourage physicians, including Plaintiffs' physicians, to recommend and perform the Essure procedure.

112.  Defendants did the above acts, which were and are illegal under federal law, the PMA and parallel state law, to encourage patients, including Plaintiffs, to undergo the Essure procedure, rather than choose an alternative procedure, such as a traditional tubal ligation.

113.  At all relevant times, Defendants were under a continuing duty under federal law, the PMA and parallel state laws to disclose the true character, quality, and nature of the increased risks, adverse events, and dangers associated with Essure.

114.  As a result of Defendants' concealment of the true character, quality and nature of their product, they are estopped from relying on any statute of limitations defense.

115.  Defendants furthered their fraudulent concealment through act and omission, including misrepresenting known dangers and/or defects in Essure and/or arising out of the use of Essure, and a continued and systematic failure to disclose and/or cover-up such information from/to the Plaintiffs, Plaintiffs' physician, and the public.

116.  Defendants' acts and omissions, before, during and/or after the act causing

Plaintiffs' injuries, prevented Plaintiffs and/or Plaintiffs' physicians from discovering the injury or cause thereof until recently.

117. Defendants' conduct, because it was purposely committed, was known or should have been known by them to be dangerous, heedless, reckless, and without regard to the consequences or the rights and safety of Plaintiffs.

## FACTS AND WARRANTIES

118. Defendants failed to abide by FDA approved training guidelines when training Plaintiffs' implanting physicians on how to use Essure and the necessary hysteroscopic equipment.

119. The skills needed to place the micro-inserts, as recognized by the FDA panel in the PMA process, "are way beyond the usual gynecologist".

120. Defendants went out and attempted to train the implanting physicians on how to use its device and the necessary hysteroscopic equipment. Defendants (1) created a "Physician Training Manual"; (2) created a simulator called EssureSim; (3) organized limited training courses where Defendants observed physicians until Defendants believed they were competent; (4) created Essure Procedure Equipment Supplies Checklists; and (5) represented to Plaintiffs that "Physicians must be signed-off to perform Essure procedures". Defendants had no experience in training others in hysteroscopy.

121. Defendants failed to abide by FDA approved training guidelines when training Plaintiffs' implanting physicians and provided hysteroscopic equipment to the implanting physicians who were not qualified to use such complicated equipment.

122. A key study found that a learning curve for this hysteroscopic procedure was seen for procedure time, but not for successful placement, pain, and complication rates, evidencing that Defendants' training methods were failing.

123. Defendants provided hysteroscopic equipment to the implanting physicians who

were not competent to use such equipment. Defendants knew the implanting physicians were not competent to use such sophisticated equipment, yet provided the equipment regardless in order to sell its product.

124.   Defendants' distribution plan of requiring the implanting physicians to purchase two Essure kits a month was an unreasonably dangerous plan, as it compelled the implanting physicians to insist that Essure be used in Plaintiffs.

125.   Defendant's distribution plan also included (1) negligently distributing an "adulterated" and "misbranded" device against its CPMA and federal law; (2) the promotion of Essure through representatives of the hysteroscopic equipment manufacturers, who were not adequately trained nor had sufficient knowledge regarding Essure; (3) failing to report and actively concealing perforations which occurred as a result of Essure; (4) erroneously using non-conforming material in the manufacturing of Essure and failing to keep track of the non-conforming material; (5) failing to use pre-sterile and post-sterile cages; (6) manufacturing Essure at an unlicensed facility; and (7) manufacturing Essure for three years without a license to do so.

126.   Lastly, Plaintiffs relied on several warranties; which were given directly by Defendant to Plaintiffs prior to implantation, on the internet, and in the implanting physicians' offices through Defendants' website and advertising, as outlined in detail *infra*.

## COUNT I
## NEGLIGENT TRAINING

127.   Plaintiffs re-allege and re-incorporate the preceding paragraphs.

128.   First, Defendants undertook an independent duty to train physicians on how to properly use Essure and place the micro-inserts, which failed to abide by FDA training guidelines.

129.   In fact, Defendants (1) created an Essure Training Program; (2) created a simulator called EssureSim; (3) organized limited training courses where Defendants observed physicians until Defendants believed they were competent; (4) created Essure Procedure Equipment Supplies

Checklists; and (5) represented to Plaintiffs that "Physicians must be signed-off to perform Essure procedures."

130.  As part of Defendants' training, Defendants had a duty to adequately train the implanting physicians on how to place Essure using its own delivery system, certify the implanting physicians, and oversee this particular procedure. In addition, considering Defendants were providing the implanting physicians with sophisticated hysteroscopic equipment, Defendants also had a duty to train the physician in hysteroscopy in a reasonably safe manner or, at the very least, ensure that the implanting physician was competent in hysteroscopy before providing them with the hysteroscopic equipment needed to place Essure. Defendants also had a duty to disclose adverse events to the physicians so that they, in turn, could properly advise their patients of the actual risks.

131.  Defendants breached this duty and parallel state laws, thereby departing from the FDA approved guidelines by:

   a.  Failing to adequately train Plaintiffs' implanting physicians on how to place the micro-inserts, including providing training differing from that of the "Physician Training Manual";

   b.  Failing to supervise the procedure;

   c.  Failing to train Plaintiffs' physicians on how to use the hysteroscopic equipment provided by Defendants; and

   d.  Failing to advise implanting physicians of the adverse events and non-conforming product.

132.  This breach caused Plaintiffs' damages as noted above.

133.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained the injuries and damages described herein.

134.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an

additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

135.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

136.  Plaintiffs has been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to Plaintiffs' significant financial detriment and loss, and Plaintiffs may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demands judgment in her favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT II
## NEGLIGENT ENTRUSTMENT

137.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

138.  Second, Defendants provided and entrusted sophisticated hysteroscopic equipment to the implanting physicians in order to sell its product.

139.  The implanting physicians were not competent to use such complicated devices, Defendants were aware of this, and provided the equipment anyway in order to sell its product.

140.  Specifically, Defendants entered into agreements with Johnson & Johnson Co., Olympus America, Inc., Richard Wolf Medical Instruments Corp., and Karl Storz Endoscopy, America, Inc., to (1) obtain specialized hysteroscopic equipment to then give to physicians, and (2) increase its sales force to promote Essure.

141.  According to Defendants, these agreements allowed Defendants to "gain market

7

presence…and expand…market opportunity by driving adoption among a group of physicians."

142.  In regard to the entrustment of such specialized equipment, Defendants admitted: "We cannot be certain how successful these programs will be, if at all." *See US SEC Form 10- Q: Quarterly Report Pursuant to Section 13 or 15(d)of the SEC Act of 1934.*

143.  Defendants invested $5 million in capital expenditures related to purchases of hysteroscopy equipment to "hand out" to physicians. *SEC Form 10-K filed on 3/15/11 by Defendants.*

144.  Moreover, Defendants stated: "We train and provide programs and all the elements that go into successful experience by the patient, including office staff training, equipment selection and other procedure room infrastructure, physician counseling skills, reimbursement and referral network building." *Defendants' Q4 2009 Earnings Call Transcript.*

145.  Defendants had a duty not to provide sophisticated hysteroscopic equipment to the implanting physicians who were not qualified to use such equipment. The implanting physicians were not expert hysteroscopists nor competent to use such equipment. Defendants were aware of this dangerous condition, but provided the physicians with the equipment in order to sell its product.

146. Defendants breached its duty by providing the implanting physicians with hysteroscopic equipment in an effort to sell its product. Defendants also failed to reasonably investigate whether or not the implanting physicians were competent to use such equipment.

147.  This breach caused Plaintiffs' damages described herein.

148.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained the injuries and damages described herein and noted above.

149.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an

additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

150.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

151.  Plaintiffs has been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to their significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demands judgment in their favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

### COUNT III
### NEGLIGENT DISTRIBUTION AND OVERPROMOTION

152.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

153.  Defendants had a duty to distribute and promote Essure in a reasonably safe manner.

154.  Defendants breached this duty by requiring the physicians to purchase two Essure "kits" per month, regardless of whether the physician used them or not, and by contracting with third parties from the hysteroscopic manufacturers to promote Essure who were not competent to perform the same.

155.  This was an unreasonably dangerous and negligent distribution plan aimed solely at capturing the market with reckless disregard for the safety of the public.

156.  This was an unreasonably dangerous distribution scheme as it compelled the implanting physicians to sell two devices per month at the expense of Plaintiffs' safety and well-being, and also entailed representatives of third parties, who did not have knowledge of Essure, to promote Essure.

157.  Defendants breached this duty by promoting Essure as described in the preceding paragraphs of this complaint.

158.  Defendants' also breached this duty by (1) negligently distributing Essure in violation of FDA orders and sections 501(f), 502(q) and (r) of the FD&C Act by marketing and selling an "adulterated" and "misbranded" product; (2) promoting Essure through representatives of the hysteroscopic equipment manufacturers, who were not adequately trained nor had sufficient knowledge regarding Essure; (3) failing to report and actively concealing adverse events which occurred as a result of Essure; (4) erroneously using non-conforming material and failing to keep track of the same in the manufacturing of Essure; (5) failing to use pre-sterile and post- sterile cages; (6) manufacturing Essure at an unlicensed facility; and (7) manufacturing Essure for three years without a license to do so.

159.  This breach caused Plaintiffs' damages as described herein.

160.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained the injuries and damages noted above and described herein.

161.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

162.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

7

163.  Plaintiffs have been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to their significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in her favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT IV
## NEGLIGENCE – RISK MANAGEMENT

164.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

165.  Defendants had a duty to prepare and have in place a risk management procedure to deal with consumer complaints.

166.  Defendants breached this duty by not having in place such procedure.

167.  This is evidence by the FDA findings, which reported that Defendants were failing to report consumer reports to the FDA. The FDA obtained an internal excel spreadsheet with 16,047 entries for complaints which were not properly reported as MDR's to the FDA. The FDA noted violations of the FD&C Act for such act. Specifically, Defendants were: "Not reporting complaints in which their product migrated from the fallopian tube into the peritoneal cavity…the firm did not consider these complaints in their risk analysis…and failed to document CAPA activities for a supplier corrective action."

168.  On January 6, 2011, Defendants were cited for their risk analysis of Essure being incomplete. Specifically, the FDA found that the Design Failure Modes Effects Analysis for Essure didn't include as a potential failure mode or effect, location of the micro-insert coil in the peritoneal

cavity.

169. On January 6, 2011, Defendants were cited for not documenting Corrective and Preventive Action Activities. Specifically, the FDA found that there were failures in Defendants' Design. The FDA also found that Defendants' CAPA did not mention the non-conformity of materials used in Essure or certain detachment failures. The FDA found that Defendants' engineers learned of these issues and it was not documented and instead was actively concealed by Defendants.

170. On July 7, 2003, Defendants were cited for not analyzing to identify existing and potential causes of non-conforming product and other quality problems. Specifically, two lot history records showed rejected raw material, which was not documented on a quality assurance form, which is used to track the data. (Inner/outer coil subassemblies were rejected but then not documented, leading to the question of where the rejected components went). This was actively concealed by Defendants.

171. On July 7, 2003, Defendants were cited for not following procedures used to control products, which did not conform to specifications.

172. This was unreasonably dangerous and negligent as it put Plaintiffs at unnecessary risk of injury.

173. This breach caused Plaintiffs' damages as described herein.

174. As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained the injuries and damages noted above and described herein.

175. As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing,

treatment and rehabilitation into the indefinite future.

176.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

177.  Plaintiffs have been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to their significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in her favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT V
## BREACH OF EXPRESS WARRANTIES

178.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

179.  Under PA law, both state and federal courts have held that Plaintiffs' claims for breach of express warranties are not preempted by the MDA. *Rosci v Acromed, Inc.,* 447 Pa. Super. 403 (1995); *Bentzley v Medtronic, Inc.,* 2011 U.S. Dist. Lexis 136570 (E.D. Pa. Nov. 28, 2011).

180.  The FDA's CPMA order confirms this: the FDA "does not evaluate information related to contractual liability warranties, however, you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws."

181.  This claim arises out of injuries caused by Defendants' express warranties to Plaintiffs, which were specifically negotiated and expressly communicated to Plaintiffs by

Defendants or its agents in such a manner that Plaintiffs understood and accepted them.

182. Plaintiffs relied on the warranties mentioned *supra.*

183. Defendants "affirmations of fact or promises" and "descriptions" as described above in "Facts and Warranties" regarding Essure created a basis of the bargain between Plaintiffs and Defendants.

184. The warranties were specifically negotiated, directed, intended, and expressly communicated to Plaintiffs in such a manner that Plaintiffs understood and accepted them.

185. These warranties, in effect, over-promoted Essure and nullified otherwise adequate warnings.

186. As a result of Defendant's warranties and Plaintiffs' reliance on same, Plaintiffs have suffered damages. Specifically, the Essure device did not perform as warranted and instead caused other injuries described herein.

187. As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained the injuries and damages noted above and described herein.

188. As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

189. As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

190. Plaintiffs has been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to her significant

financial detriment and loss, and she may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in their favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT VI
## PA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION

191.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

192.  Plaintiffs purchased and had the Essure device implanted.

193.  This transaction was for a good, Essure.

194.  Essure was inserted into Plaintiffs primarily for personal purposes.

195.  Plaintiffs suffered damages arising from the purchase and insertion of Essure.

196.  Moreover, Plaintiffs' loss was caused by justifiable reliance of deceptive conduct, specifically the warranties and advertisements outlined in the preceding paragraphs and the active concealment of adverse incidents, use of non-conforming product, and incomplete risk analysis, as noted *infra.*

197.  As a result of Defendant's negligence, breaches of warranty, fraud, and unfair trade practices, Plaintiffs have sustained the injuries and damages noted above. Specifically, the Essure device did not perform as warranted and instead caused the injuries noted above.

198.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

7

199.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

200.  Plaintiffs have been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to their significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in their favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT VII
## FRAUDULENT CONCEALMENT

201.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

202. Under PA law, fraudulent concealment is simply a type of fraudulent misrepresentation, the concealment substituting for the false words. Active concealment of defects is the legal equivalent to an affirmative misrepresentation.

203. First, Defendants fraudulently concealed 16,047 complaints from Plaintiffs regarding Essure where pain was experienced by consumers. The concealment took place at 331 E. Evelyn Avenue, Mountain View, California, 94041, and was uncovered by the FDA between 5/30/2013 and 6/26/2013.

204. This concealment was memorialized by Timothy Grome on 6/26/2013 in an Establishment Inspection Report by the FDA where he states: "the inspection found that the firm was not reporting as MDRs complaints in which their product migrated from the fallopian tube into

the peritoneal cavity…the firm did not consider these complaints in their risk analysis…and the firm failed to document CAPA activities."

205.  Second, Defendants fraudulently concealed eight perforations which occurred as a result of Essure, and which Defendants failed to disclose to Plaintiffs and the FDA. The concealment took place at 331 E. Evelyn Avenue, Mountain View, California, 94041, and was uncovered by the FDA, specifically Lana Widman, on 1/25/2011.

206.  This concealment was memorialized by Lana Widman on 1/25/11 in an Investigative Report and Form 483 by the FDA where she states: "the firm had not properly evaluated eight complaints of peritoneal perforation for reporting to the FDA as an adverse event. Also, the firm's risk analysis did not include an evaluation of the risk associate with perforation of the peritoneal cavity."

207.  Third, on January 6, 2011, the FDA issued a violation to Defendants for the following: "An MDR report was not submitted within 30 days of receiving or otherwise becoming aware of information that reasonably suggests that a marketed device may have caused or contributed to a death or serious injury if the malfunction were to recur." These failures include regarding perforation of bowels, Essure coils breaking into pieces, and Essure coils migrating out of the fallopian tubes. Defendants had notice of 168 perforations but only disclosed 22 to the FDA. Defendants were issued these violations for dates of incidents on 5/11/10, 9/1/10, 10/1/10, 10/5/10, 10/26/10, 11/3/10, 11/5/10, and 11/16/10.

208.  Fourth, on January 6, 2011, Defendants were cited for not documenting Corrective and Preventative Action Activities. Specifically, the FDA found that there were failures in Defendants' Design. The FDA also found that Defendants' CAPA did not mention the non-conformity of materials used in Essure or certain detachment failures. The FDA found that Defendants' engineers learned of this, and it was not documented.

209.  Defendants had a duty to disclose the specific perforations under federal, state, and administrative law. Moreover, the circumstances surrounding the concealment imposed a duty to disclose to Plaintiffs, and Defendants remained silent.

210.  Defendants intentionally concealed the complaints and non-conforming product so that it would induce Plaintiffs to have Essure implanted.

211.  Plaintiffs justifiably relied on the active concealment. Specifically, Plaintiffs would not have had Essure implanted had she been aware that there were eight perforations of human cavities, or that there had been at least 16,047 complaints regarding Essure. Accordingly, the matters concealed were material.

212.  As a proximate result, Plaintiffs have sustained the injuries and damages noted above. Specifically, the Essure device did not perform as warranted and instead caused the injuries noted above.

213.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

214.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

215.  Plaintiffs have been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to their significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in her favor and

against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

**COUNT VIII**
**<u>FRAUDULENT MISREPRESENTATION</u>**

216.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

217.  Defendants made a misrepresentation, a fraudulent utterance thereof, which are specifically outlined in the preceding paragraphs.

218.  Under PA law, fraud may be established even where there is an innocently made misrepresentation so long as it relates to the material matter. Pleading the materiality of the misrepresentation substitutes for pleading the fraudulent utterance thereof.

219.  In the alternative, the representations were material to Plaintiffs having Essure placed as she would not have had the device inserted had she none of the misrepresentations.

220.  Defendants intentionally made the statements so that it would induce Plaintiffs to have Essure implanted.

221.  Plaintiffs justifiably relied on the misrepresentations. Specifically, Plaintiffs would not have had Essure implanted had they been aware that there were eight perforations of human cavities, that there had been at least 16,047 complaints regarding Essure, or the falsity of the representations specifically delineated in the preceding paragraphs.

222.  As a proximate result, Plaintiffs have sustained the injuries and damages noted above. Specifically, the Essure device did not perform as warranted and instead caused the injuries noted above.

223.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an

7

additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

224.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

225.  Plaintiffs have been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to their significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in her favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT IX
## NEGLIGENT MISREPRESENTATION

226.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

227. Defendants made misrepresentations, which are specifically outlined in the preceding paragraphs.

228.  Plaintiffs justifiably relied on the misrepresentations. Specifically, Plaintiffs would not have had Essure implanted had she been aware that there were eight perforations of human cavities, that there had been at least 16,047 complaints regarding Essure, or the falsity of the representations specifically delineated in the preceding paragraphs.

229. As a proximate result, Plaintiffs have sustained the injuries and damages noted above. Specifically, the Essure device did not perform as warranted and instead caused the injuries

noted above.

230.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

231.  As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

232.  Plaintiffs has been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to her significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in their favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT X
## STRICT LIABILITY

233.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

234.  Defendants sold Essure to Plaintiffs new.

235.  Defendants expected Essure to reach Plaintiffs in the same condition it was when it left its custody and control.

236.  Plaintiffs maintained Essure in a condition which was without substantial change from its condition when it left the custody and control of Defendants.

237.  Defendants, manufactured, supplied, warranted, sold, and placed on the market and into the stream of commerce a defective and unreasonably dangerous product, knowing that Essure would reach consumers without substantial change from its condition in which it was sold, and that at the time Essure left Defendants' control, it was defective and in an unreasonably dangerous condition.

238.  When Defendants researched, designed, tested, developed, manufactured, supplied, warranted, exported, imported, assembled, marketed, promoted, distributed and/or sold Essure, they were aware that it was not reasonably safe and effective.

239.  Defendants have known, and knew at the time of manufacture of Essure, that it posed a serious and imminent danger to the lives and safety of consumers.

240.  Defendants have known, and knew at the time of manufacture of Essure, that a safe and effective Essure, free from defect, must contain effective and  adequate warnings and safety devices designed to prevent, and which actually prevent harm to Essure consumers.

241.  The aforementioned Essure was not equipped with every element necessary to make it safe for its reasonably foreseeable users.

242.  The aforementioned Essure was defective and not safe for its reasonably foreseeable users in that it subjected Plaintiffs to serious injuries when the aforementioned product was used, and/or serviced in an intended and foreseeable manner. Essure's defects as well as Defendants' failures include, but are not limited to, the following:

    a.  Designing, manufacturing, assembling, marketing, selling and distributing Essure;

    b.  Essure is defective in design because it is defectively designed to malfunction during foreseeable use including implementation, and can migrate and break;

    c.  Not using conforming materials and then failing to document the same;

    d.  Essure is defective because Defendants failed to provide adequate warnings;

    e.   Essure is defective in design because it is more dangerous than would be contemplated by an ordinary user, and because the risks of the product outweigh the benefits;

    f.   Essure is defectively manufactured as they failed to comply with their own specifications; and

    g.   Such other acts or omissions as many be ascertained through discovery, or as may be demonstrated by the evidence produced at trial.

243.  Defendants are strictly liable to Plaintiffs pursuant to Section 402A of the Restatement (Second) of Torts.

244.  The defective condition of Essure was the factual cause of Plaintiffs' injuries as damages, as described above.

245.  Defendants failed to adequately test the product prior to manufacture, marketing, distributing, and failed to test the product subsequent to assembling, including consistent with CPMA conditions.

246.  Defendants failed to adequately instruct the implanting physicians.

247.  Defendants failed to adequately visually inspect Essure after completion of assembly.

248.  Defendants failed to adequately visually inspect Essure immediately prior to delivery to Plaintiffs and/or Plaintiffs' implanting physician.

249.  Defendants' failure to perform adequate testing, inspections, and give adequate and appropriate information, warning, and directions were a direct and proximate cause of the severe and permanent injuries suffered by Plaintiffs.

250.  Upon information and belief, when Essure was manufactured, Defendants had the technological capability to design and manufacture Essure in a reasonably safe manner.

251.  At all times referenced herein, Defendants were acting as agents and employees of each other and were acting within the scope, purpose, and authority of that agency and employment

with full knowledge, permission and consent of each other Defendant.

252. Defendants manifested a conscious or reckless disregard for the rights of others, and a conscious or reckless imposition of the risk of death or serious bodily injury upon the users of its product by:

a. Failing to design Essure in a reasonably safe manner;

b. Failing to supply warnings and/or adequate directions or warnings and by providing directions inconsistent with its CPMA;

c. Failing to equip Essure with materials that would not easily become damages, migrate, and/or deteriorate over time;

d. Failing to warn of the same; and

e. Failing to use conforming material.

253. As a proximate result, Plaintiffs have sustained the injuries and damages described above. Specifically, the Essure device did not perform as warranted and instead caused the injuries described above.

254. As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

255. As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

256. Plaintiffs have been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to their significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in their favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT XI
## <u>NEGLIGENT DESIGN</u>

257.  Plaintiffs re-allege and re-incorporate the preceding paragraphs.

258.  Plaintiffs' injuries were caused by the negligent and reckless conduct of Defendants in researching, designing testing, developing, manufacturing, importing, marketing, advertising, distributing, assembling, and selling Essure, and by engaging in the following negligent and reckless conduct, all of which hinge on violations of the FDA requirements:

  a. Failing to design a safe and effective micro-insert;

  b. Carelessly and negligently selling and distributing Essure in violation of the CPMA and federal law;

  c. Carelessly and negligently selling and distributing Essure;

  d. Carelessly and negligently selling and distributing Essure, which failed;

  e. Carelessly and negligently selling and distributing Essure that violated the CPMA;

  f. In breach of their duty, Defendants negligently incorporated into the design and assembly of the Essure parts that could not stand up to normal usage;

  g. Failing to design, develop, manufacture, market, sell, and distribute Essure such that it would not injure users;

  h. Negligently failing to properly design, develop, and manufacture the component parts; and

  i. Such other acts or omissions constituting carelessness, negligence, recklessness, and gross negligence as many be ascertained through discovery, or as many be demonstrated by the evidence adduced at trial.

259.  Defendants failed to adequately test and/or visually inspect the product prior to

manufacture, marketing, and distributing, and failed to test the product subsequent to assembly and/or immediately prior to delivery to Plaintiffs and/or Plaintiffs' implanting physician.

260. Defendants' failure to perform adequate testing, inspections, and give adequate and appropriate information, warning, and directions were a direct and proximate cause of the severe and permanent injuries suffered by Plaintiffs.

261. At all times referenced herein, Defendants, and each of them, were acting as agents and employees of each other and were acting within the scope, purpose, and authority of that agency and employment with full knowledge, permission and consent of each other Defendant.

262. As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs had to undergo a diagnostic procedure, an additional surgical procedure, and may have to undergo additional surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

263. As a result of Defendants' negligence, breaches of warranty, fraud, and unfair trade practices, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, permanent injuries, both physical and mental, and will continue to do so into the indefinite future.

264. Plaintiffs have been forced to expend significant sums of money for treatment of the surgeries, testing, medicine, and therapies, along with related expenses, all to their significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in her favor and against Defendants for an amount in excess of $50,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## NEGLIGENCE – FAILURE TO WARN – COUNT XI

*299.*    Plaintiffs re-allege and re-incorporate the preceding paragraphs.

*300.*    Plaintiffs' injuries were caused by the negligent and reckless conduct of Defendant in failing to warn Plaintiffs or their implanting physicians, all of which hinge on violations of federal law and its CPMA.

*301.*    Defendant had a duty to warn Plaintiffs and/or their implanting physicians consistent with federal law and its CMPA which included:

(a)    21 C.F.R. 814, governing premarket approval of medical devices, a *Statement of material fact* means a representation that tends to show that the safety or effectiveness of a device is more probable than it would be in the absence of such a representation. A false affirmation or silence or an omission that would lead a reasonable person to draw a particular conclusion as to the safety or effectiveness of a device also may be a false statement of material fact, even if the statement was not intended by the person making it to be misleading or to have any probative effect.

(b)    21 C.F.R. 814.80 – A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with a condition of approval specified in the PMA approval order for the device.

(c)    21 C.F.R. 820.65 – establish and maintain procedures for identifying with a control number each unit, lot, or batch of finished devices and where appropriate components. The procedures shall facilitate corrective action.

(d)    21 C.F.R. 803.1(a) – This part establishes the requirements for medical device reporting for device user facilities, manufacturers, importers, and distributors. If you are a device user facility, you must report deaths and serious injuries that a device has or may have caused or contributed to, establish and maintain adverse event files, and submit summary annual reports. If you are a manufacturer or importer, you must report deaths and serious injuries that your device has or may have caused or contributed to, you must report certain device malfunctions, and you must establish and maintain adverse event files. If you are a manufacturer, you must also submit specified follow up. These

7

reports help us to protect the public health by helping to ensure that devices are not adulterated or misbranded and are safe and effective for their intended use.

(e)    21 C.F.R. 803.10 – (a) If you are a device user facility, you must submit reports (described in subpart C of this part), as follows: (1) Submit reports of individual adverse events no later than 10 work days after the day that you become aware of a reportable event: (i) Submit reports of device-related deaths to us and to the manufacturer, if known; or (ii) Submit reports of device-related serious injuries to the manufacturers or, if the manufacturer is unknown, submit reports to us. (2) Submit annual reports (described in 803.33) to us. (b) If you are an importer, you must submit reports (described in subpart D of this part), as follows: (1) Submit reports of individual adverse events no later than thirty

(30) calendar days after the day that you become aware of a reportable event: (i) Submit reports of device-related deaths or serious injuries to us and to the manufacturer; or (ii) Submit reports of device-related malfunctions to the manufacturer. (2) [Reserved]. (c) If you are a manufacturer, you must submit reports (described in subpart E of this part) to us, as follows: (1) Submit reports of individual adverse events no later than thirty (30) calendar days after the day that you become aware of a reportable death, serious injury, or malfunction. (2) Submit reports of individual adverse events no later than five (5) work days after the day that you become aware of: (i) A reportable event that requires remedial action to prevent an unreasonable risk of substantial harm to the public health, or (ii) A reportable event for which we made a written request.

(3) Submit supplemental reports if you obtain information that you did not submit in an initial report.

(f)    21 C.F.R. 803.50(a) – (a) If you are a manufacturer, you must report to us no later than 30 calendar days after the day that you receive or otherwise become aware of information, from any source, that reasonably suggests that a device that you market: (1) May have caused or contributed to a death or serious injury; or (2) Has malfunctioned and this device or a similar device that you market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur. (b) What information does FDA consider "reasonably known" to me? (1) You must submit all information required in this subpart E that is reasonably known to you. We consider the following information to be reasonably known to you: (i) Any information that you can obtain by contacting a user facility, importer, or other initial reporter; (ii) Any information in your possession; or (iii) Any information that you can obtain by analysis, testing, or other evaluation of the device. (2) You are responsible for obtaining and submitting to us information that is incomplete or missing from reports submitted by user facilities, importers, and other initial reporters. (3) You are also responsible for conducting an investigation of each event and evaluating the cause of the event. If you cannot submit complete information on a report, you must provide a statement explaining why this information was incomplete and the steps you took to obtain the information. If you later obtain any required information that was not available at the time you filed your

initial report, you must submit this information in a supplemental report under 803.56.

(g)    21 C.F.R. 803.53 – You must submit a five (5) day report to us, on Form 3500A or an electronic equivalent approved under 803.14, no later than five (5) work days after the day that you become aware that: (a) An MDR reportable event necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health. You may become aware of the need for remedial action from any information, including any trend analysis; or (b) We have made a written request for the submission of a five (5) day report. If you receive such a written request from us, you must submit, without further requests, a five (5) day report for all subsequent events of the same nature that involve substantially similar devices for the time period specified in the written  request. We may extend the time period stated in the original written request if we determine it is in the interest of the public health.

(h)    21 C.F.R. 806.10 – (a) Each device manufacturer or importer shall submit a written report to FDA of any correction or removal of a device initiated by  such manufacturer or importer if the correction or removal was initiated: (1) To reduce a risk to health posed by the device; or (2) To remedy a violation of the act caused by the device which may present a risk to health unless the information has already been provided as set forth in paragraph (f) of this section or the corrective or removal action is exempt from the reporting requirements under 806.1(b). (b) The manufacturer or importer shall submit  any report required by paragraph (a) of this section within ten (10) working days of initiating such correction or removal. (c) The manufacturer or importer shall include the following information in the report: (1) The seven (7) digit registration number of the entity responsible for submission of the report of corrective or removal action (if applicable), the month, day, and year that the report is made, and a sequence number (i.e., 001 for the first report, 002 for the second report, 003 etc.), and the report type designation "C" or "R". For example, the complete number for the first correction report submitted on June 1, 1997, will appear as follows for a firm with the registration number 1234567: 1234567-6/1/97-001-C. The second correction report number submitted by the same firm on July 1, 1997, would be 1234567-7/1/97-002-C etc. For removals, the number will appear as follows: 1234567-6/1/97-001-R and 1234567-7/1/97-002-R, etc. Firms that do not have a seven-digit registration number may use seven zeros followed by the month, date, year,  and sequence number (i.e. 0000000-6/1/97-001-C for corrections and 0000000- 7/1/97-001-R for removals). Reports received without a seven (7) digit registration number will be assigned a seven (7) digit central file number by the district office reviewing the reports. (2) The name, address, and telephone number of the manufacturer or importer, and the name, title, address, and telephone number of the manufacturer or importer representative responsible for conducting the device correction or removal. (3) The brand name and the common name, classification name, or usual name of the device and the intended use of the device. (4) Marketing status of the device, i.e., any

applicable premarket notification number, premarket approval number, or indication that the device is a pre-amendments device, and the device listing number. A manufacturer or importer that does not have an FDA establishment registration number shall indicate in the report whether it has ever registered with FDA. (5) The unique device identifier (UDI) that appears on the device label or on the device package, or the device identifier, universal product code (UPC), model, catalog, or code number of the device and the manufacturing lot or serial number of the device or other identification number. (6) The manufacturer's name, address, telephone number, and contact person if different from that of the person submitting the report. (7) A description of the event(s) giving rise to the information reported and the corrective or removal actions that have been, and are expected to be taken. (8) Any illness or injuries that have occurred with use of the device. If applicable, include the medical device report numbers. (9) The total number of devices manufactured or distributed subject to the correction or removal and the number in the same batch, lot, or equivalent unit of production subject to the correction or removal.

(10) The date of manufacture or distribution and the device's expiration date or expected life. (11) The names, addresses, and telephone numbers of all domestic and foreign consignees of the device and the dates and number of devices distributed to each such consignee. (12) A copy of all communications regarding the correction or removal and the names and addresses of all recipients of the communications not provided in accordance with paragraph (c)(11) of this section. (13) If any required information is not immediately available, a statement as to why it is not available and when it will be submitted. (d) If, after submitting a report under this part, a manufacturer or importer determines that the same correction or removal should be extended to additional lots or batches of the same device, the manufacturer or importer shall within ten (10) working days of initiating the extension of the correction or removal, amend the report by submitting an amendment citing the original report number assigned according to paragraph (c)(1) of this section, all of the information required by paragraph (c)(2), and any information required by paragraphs (c)(3) through (c)(12) of this section that is different from the information submitted in the original report. The manufacturer or importer shall also provide a statement in accordance with paragraph (c)(13) of this section for any required information that is not readily available. (e) A report submitted by a manufacturer or importer under this section (and any release by FDA of that report or information) does not necessarily reflect a conclusion by the manufacturer, importer, or FDA that the report or information constitutes an admission that the device caused or contributed to a death or serious injury. A manufacturer or importer need not admit, and may deny, that the report or information submitted under this section constitutes an admission that the device caused or contributed to a death or serious injury. (f) No report of correction or removal is required under this part, if a report of the correction or removal is required and has been submitted under parts 803 or 1004 of this

chapter. [62 FR 27191, May 19, 1997, as amended at 63 FR 42232, Aug. 7, 1998; 69 FR 11311, Mar. 10, 2004; 78 FR 55821, Sept. 24, 2013].

(i)  21 C.F.R. 814.84 – (a) The holder of an approved PMA shall comply with the requirements of part 803 and with any other requirements applicable to the device by other regulations in this subchapter or by order approving the device. (b) Unless FDA specifies otherwise, any periodic report shall: (1) Identify changes described in 814.39(a) and changes required to be reported to FDA under 814.39(b). (2) Contain a summary and bibliography of the following information not previously submitted as part of the PMA: (i) Unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonably should be known to the applicant. (ii) Reports in the scientific literature concerning the device and known to or that reasonably should be known to the applicant. If, after reviewing the summary and bibliography, FDA concludes that the agency needs a copy of the unpublished or published reports, FDA will notify the applicant that copies of such reports shall be submitted. (3) Identify changes made pursuant to an exception or alternative granted under 801.128 or 809.11 of this chapter. (4) Identify each device identifier currently in use for the device, and each device identifier for the device that has been discontinued since the previous periodic report. It is not necessary to identify any device identifier discontinued prior to December 23, 2013.

(j)  21 C.F.R. 820.65 – Each manufacturer of a device that is intended for surgical implant into the body or to support or sustain life and whose failure to perform when properly used in accordance with instructions for use provided in the labeling can be reasonably expected to result in a significant injury to the user shall establish and maintain procedures for identifying with a control number each unit, lot, or batch of finished devices and where appropriate components. The procedures shall facilitate corrective action. Such identification shall be documented in the DHR.

(k)  21 C.F.R. 822 – Post market surveillance – This part implements section 522 of the Federal Food, Drug, and Cosmetic Act (FDCA) by providing procedures and requirements for post-market surveillance of class II and class III devices that meet any of the following criteria: (a) Failure of the device would be reasonably likely to have serious adverse health consequences; (b) The device is intended to be implanted in the human body for more than one (1) year;… The purpose of this part is to implement our postmarket surveillance authority to maximize the likelihood that postmarket surveillance plans will result in the collection of useful data. These data can reveal unforeseen adverse events, the actual rate of anticipated adverse events, or other information necessary to protect the public health.

(l)  21 C.F.R. 820.100(a) 6-7 – Corrective and Preventive Action – (a) Each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for: (1) Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and

7

other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems; (2) Investigating the cause of nonconformities relating to product, processes, and the quality system; (3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems; (4) Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device; (5) Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems; (6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and (7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions, for management review. (b) All activities required under this section, and their results, shall be documented.

(m)     21 C.F.R. 820.70(e)(h) (a) *General.* Each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications. Where process controls are needed they shall include: (1) Documented instructions, standard operating procedures (SOP's), and methods that define and control the manner of production; (2) Monitoring and control of process parameters and component and device characteristics during production; (3) Compliance with specified reference standards or codes; (4) The approval of processes and process equipment; and (5) Criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples. (b) *Production and process changes.* Each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure. Such changes shall be verified or where appropriate validated according to 820.75, before implementation and these activities shall be documented. Changes shall be approved in accordance with 820.40. (e) *Contamination control.* Each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

(h) *Manufacturing material.* Where a manufacturing material could reasonably be expected to have an adverse effect on product quality, the manufacturer shall establish and maintain procedures for the use and removal of such manufacturing material to ensure that it is removed or limited to an amount that does not adversely affect the device's quality. The removal or reduction of such manufacturing material shall be documented.

(n)     21 C.F.R. 820.90 – (a) *Control of nonconforming product.* Each manufacturer shall establish and maintain procedures to control product that does not

conform to specified requirements. The procedures shall address the identification, documentation, evaluation, segregation, and disposition of nonconforming product. The evaluation of nonconformance shall include a determination of the need for an investigation and notification of the persons or organizations responsible for the nonconformance. The evaluation and any investigation shall be documented. (b) *Nonconformity review and disposition.* (1) Each manufacturer shall establish and maintain procedures that define the responsibility for review and the authority for the disposition of nonconforming product. The procedures shall set forth the review and disposition process. Disposition of nonconforming product shall be documented. Documentation shall include the justification for use of nonconforming product and the signature of the individual(s) authorizing the use. (2) Each manufacturer shall establish and maintain procedures for rework, to include retesting and reevaluation of the nonconforming product after rework, to ensure that the product meets its current approved specifications. Rework and reevaluation activities, including a determination of any adverse effect from the rework upon the product, shall be documented in the DHR.

(o)    21 C.F.R. 820.90 – (a) Each manufacturer shall establish and maintain procedures for the control of storage areas and stock rooms for product to prevent mix-ups, damage, deterioration, contamination, or other adverse effects pending use or distribution and to ensure that no obsolete, rejected, or deteriorated product is used or distributed. When the quality of product deteriorates over time, it shall be stored in a manner to facilitate proper stock rotation, and its condition shall be assessed as appropriate. (b) Each manufacturer shall establish and maintain procedures that describe the methods for authorizing receipt from and dispatch to storage areas and stock rooms.

(p)    21 C.F.R. 820.180 – All records required by this part shall be maintained at the manufacturing establishment or other location that is reasonably accessible to responsible officials of the manufacturer and to employees of FDA designated to perform inspections. Such records, including those not stored at the inspected establishment, shall be made readily available for review and copying by FDA employee(s). Such records shall be legible and shall be stored to minimize deterioration and to prevent loss. Those records stored in automated data processing systems shall be backed up.

(q)    21 C.F.R. 820.198 – (a) Each manufacturer shall maintain complaint files. Each manufacturer shall establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit. Such procedures shall ensure that: (1) All complaints are processed in a uniform and timely manner; (2) Oral complaints are documented upon receipt; and (3) Complaints are evaluated to determine whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting. (b) Each manufacturer shall review and evaluate all complaints to determine whether an investigation is necessary. When no investigation is made, the manufacturer shall maintain a record that includes the reason no investigation was made and the name of the individual responsible for the

decision not to investigate. (c) Any complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated, unless such investigation has already been performed for a similar complaint and another investigation is not necessary. (d) Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by 820.198(e), records of investigation under this paragraph shall include a determination of: (1) Whether the device failed to meet specifications; (2) Whether the device was being used for treatment or diagnosis; and (3) The relationship, if any, of the device to the reported incident or adverse event. (e) When an investigation is made under this section, a record of the investigation shall be maintained by the formally designated unit identified in paragraph (a) of this section. The record of investigation shall include: (1) The name of the device; (2) The date the complaint was received; (3) Any unique device identifier (UDI) or universal product code (UPC), and any other device identification(s) and control number(s) used; (4) The name, address, and phone number of the complainant;

(5) The nature and details of the complaint; (6) The dates and results of the investigation; (7) Any corrective action taken; and (8) Any reply to the complainant. (f) When the manufacturer's formally designated complaint unit is located at a site separate from the manufacturing establishment, the investigated complaint(s) and the record(s) of investigation shall be reasonably accessible to the manufacturing establishment. (g) If a manufacturer's formally designated complaint unit is located outside of the United States, records required by this section shall be reasonably accessible in the United States at either: (1) A location in the United States where the manufacturer's records are regularly kept; or (2) The location of the initial distributor.

(r)    21 C.F.R. 820.30 – Each manufacturer of any class III or class II device, and the class I devices listed in paragraph (a)(2) of this section, shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

(s)    21 U.S.C. 352(q)(1) and 21 U.S.C. 331(a) – A drug or device shall be deemed to be misbranded…if its labeling is false or misleading. The following acts and the causing thereof are prohibited: the introduction or delivery for introduction into interstate commerce…any device that is adulterated or misbranded.

(t)    21 U.S.C. 351(a) (h) – A drug or device shall deemed to be adulterated…if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth….or its manufacturing, processing, packing, or holding do not conform with current good manufacturing practice…if it is…not in conformity with…an applicable condition prescribed by an order.

(u)    21 U.S.C. 352 (q) (r) – Restricted devices using false or misleading advertising or used in violation of regulations. In the case of any restricted device distributed or offered for sale in any State, if (1) its advertising is false or

80

misleading in any particular, or (2) it is sold, distributed, or used in violation of regulations prescribed under section 360j(e) of this title. Restricted devices not carrying requisite accompanying statements in advertisements and other descriptive printed matter. In the case of any restricted device distributed or offered for sale in any State, unless the manufacturer, packer, or distributor thereof includes in all advertisements and other descriptive printed matter issued or caused to be issued by the manufacturer, packer, or distributor with respect to that device (1) a true statement of the device's established name as defined in subsection (e) of this section, printed prominently and in type at least half as large as that used for any trade or brand name thereof, and (2) a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications and, in the case of specific devices made subject to a finding by the Secretary after notice and opportunity for comment that such action is necessary to protect the public health, a full description of the components of such device or the formula showing quantitatively each ingredient of such device to the extent required in regulations which shall be issued by the Secretary after an opportunity for a hearing.

(v)     FDA requirement in CPMA order – "Within ten (10) days after [Defendant] receives knowledge of any adverse reaction to report the matter to the FDA."

(w)     FDA requirement in CPMA order – "Report to the FDA under the MDR whenever it receives information from any source that reasonably suggests that the device may have caused or contributed to a serious injury."

(x)     FDA requirement in CPMA order – Report Due Dates – six month, one year, eighteenth month, and two (2) year reports.

(y)     FDA requirement in CPMA order – A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in a CPMA approval order for the device. 21 C.F.R. Section 814.80.

(z)     FDA requirement in CPMA order – Warranties are truthful, accurate, and not misleading…Warranties are consistent with applicable federal and state law.

***302.***    Defendant breached these duties by not complying with the CPMA or federal law:

(a)     Defendant failed to timely provide the FDA with reports after twelve (12) months, eighteen (18) months and then a final report for one (1) schedule. Defendant also failed to timely submit post approval reports for its six (6) month, one (1) year, eighteenth (18th) month and two (2) year reports. All reports failed to meet the respective deadlines.

(b)     Defendant failed to document successful placement of Essure® concealing the failure rates.

(c)     Defendant failed to notice the FDA of several adverse reactions and actively concealed the same. Defendant failed to report eight (8) perforations which occurred as a result of Essure® and was cited for the same by the FDA via Form 483.

(d)     Defendant failed to report to the FDA information it received that reasonably suggested that the device may have caused or contributed to a serious injury concealing the injuries. Again, Defendant failed to report eight (8) perforations as adverse events which occurred as a result of Essure® to the FDA as evidenced in Form 483.

(e)     Defendant failed to notice the FDA of their internal excel file containing 16,047 entries of complaints.

(f)     Defendant excluded the risk assessment for safety of loose coils in its Risk Management Plan and stated that Defendant had violated the FDCA.

(g)     Erroneously using non-conforming material in the manufacturing of Essure®.

(h)     Failing to use pre-sterile and post-sterile cages.

(i)     Manufacturing Essure® at an unlicensed facility.

(j)     Manufacturing Essure® for three (3) years without a license to do so.

(k)     Not reporting … complaints in which their product migrated.

(l)     Not considering these complaints in their risk analysis for the design of Essure®.

(m)     Failing to document CAPA activities for a supplier corrective action.

(n)     On January 6, 2011, the FDA issued a violation to Defendant for the following: "An MDR report was not submitted within thirty (30) days of receiving or otherwise becoming aware of information that reasonably suggests that a marketed device may have caused or contributed to a death or serious injury if the malfunction were to recur." Form 483/Violation form issued by Timothy Grome on January 6, 2011. These failures included incidents regarding perforation of bowels, Essure® coils breaking into pieces, and Essure® coils migrating out of the fallopian tubes. Defendant was issued these violations for dates of incidents 5/11/10, 9/1/10, 10/1/10, 10/5/10, 10/26/10, 11/3/10, 11/5/10, and 11/16/10.

(o)     Defendant had notice of one hundred and sixty-eight (168) perforations but only disclosed twenty-two (22) to the FDA.

(p)     On January 6, 2011, Defendant was cited for their risk analysis of Essure® being incomplete. Specifically, the FDA found that the Design Failure Modes Effects Analysis for Essure® did not include as a potential failure mode or effect, location of the micro-insert coil in the peritoneal cavity.

(q)     On January 6, 2011, Defendant was cited for not documenting Corrective and Preventive Action Activities. Specifically, the FDA found that there were failures in Defendant's Design. The FDA also found that Defendant's CAPA did not mention the non-conformity of materials used in Essure® or certain detachment failures. The FDA found that Defendant's engineers learned of this and it was not documented.

(r)     On July 7, 2003, Defendant was cited for not analyzing to identify existing and potential causes of non-conforming product and other quality problems. Specifically, two lot history records showed rejected raw material which was not documented on a quality assurance form, which is used to track the data. (Inner/outer coil subassemblies were rejected but then not documented, leading to the question of where the rejected components went).

(s)    On July 7, 2003, Defendant was cited for not following procedures used to control products which did not confirm to specifications.

(t)    Defendant failed to disclose to Plaintiffs and their implanting physicians the fact that Defendant's altered medical records to reflect less pain then was being reported during the clinical studies for Essure® and changed the birth dates of others to obtain certain age requirements that were needed to go through the PMA process.

303.    Had Defendant disclosed such information as was required by the CPMA and federal law to Plaintiffs or the Implanting Physicians, Plaintiffs would never have had Essure® implanted and would have avoided their injuries.

304.    At all times referenced herein, Defendant and each of them were acting as agents and employees of each of the other Defendant and were acting within the scope, purpose and authority of that agency and employment and with full knowledge, permission and consent of each other Defendant.

305.    As a result of Defendant's negligence, individually, jointly, and severally, Plaintiffs sustained the injuries noted above.

306.    As a result of Defendant's negligence, individually, jointly, and severally, Plaintiffs had to undergo numerous surgical procedures, diagnostic procedures, and may have to undergo surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

307.    As a result of Defendant's negligence, individually, jointly, and severally, Plaintiffs sustained significant pain and suffering, both physical and mental, and will continue to do so into the indefinite future.

308.    Plaintiffs have been forced to expend significant sums of money for treatment of the multitude of surgeries, testing, medicine, and therapies, along with related expenses, all to their significant financial detriment and loss, and they may have to endure significant financial expenditures into the foreseeable future.

*309.*    Plaintiffs have suffered a significant decrease in their ability to earn money in the future, as well as a significant loss of earning capacity.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in their favor and against Defendant for an amount in excess of $75,000.00 each, including compensatory damages, punitive damages, incidental expenses, consequential damages, including pain and suffering which was a foreseeable consequential damage, delayed damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## PRAYER FOR DAMAGES

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, as appropriate to each cause of action alleged and as appropriate to the standing of Plaintiffs, as follows:

a.    Physical pain and suffering in the past and which, in reasonable probability, Plaintiffs will continue to suffer in the future;

b.    Physical impairment and incapacity in the past and which, in reasonable probability, Plaintiffs will continue to suffer in the future;

c.    Mental anguish in the past and which, in reasonable probability, Plaintiffs will sustain in the future;

d.    Reasonable and necessary medical expenses for treatment received in the past, and, based upon reasonable medical probability, the reasonable medical expenses Plaintiffs will incur in the future;

e.    Disfigurement in the past and which, in reasonable probability, Plaintiffs will continue to suffer in the future;

f.    Punitive damages;

g.    Plaintiffs be awarded full, fair, and complete recovery for all claims and causes of action relevant to this action;

h.    Plaintiffs be awarded all appropriate costs, fees, expenses, and prejudgment and post-judgment interest pursuant to the laws of the Commonwealth of

Pennsylvania as authorized by law on the judgements entered in Plaintiffs' behalf; and

i.      Such other relief the court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury on all issues.

Respectfully Submitted,

**McELDREW PURTELL**
*Local counsel for Plaintiffs*
123 So. Broad Street, Ste. 2250
Philadelphia, PA 19109
Phone: 215-545-8800
Fax: 215-545-8805

By:     James J. McEldrew, III, Esquire
        McEldrew Purtell
        PA Bar #: 36411
        Email: jim@mceldrewpurtell.com


**McDONALD WORLEY**
*Attorneys for Plaintiffs*
1770 St. James Place, Ste. 100
Houston, TX 77056
Phone: 281-623-1906


By:     /s/  Scott Fraser
        Scott Fraser, Esquire
        TX Bar#:  24093452
        Email: scott@mcdonaldworley.com


By:     /s/ Amy. J. Shahan
        Amy J. Shahan, Esquire
        TX Bar#: 00797564
        Email:

amyjshahan@mcdonaldworley.com

Signed: February 24, 2023